Filed 8/13/26  P. v. Collins CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>v.<br><br>XAVIER ATU COLLINS,<br>        Defendant and Appellant. | C101600<br><br>(Super. Ct. No. 23FE009283) |

A jury found defendant Xavier Atu Collins guilty of trafficking minors, dissuading a witness, and pandering a minor.  As relevant to this appeal, at sentencing the trial court said it was imposing a concurrent five-year term on the count five trafficking conviction pertaining to minor Lilly Doe, which would have resulted in an aggregate sentence of 15 years to life in prison, but it later said the aggregate sentence was 15 years to life plus five years.

Defendant now contends (1) there is insufficient evidence to support his count five trafficking conviction pertaining to Lilly, and (2) the abstract of judgment does not accurately reflect the trial court's oral pronouncement of sentence because it indicates the sentence on count five was imposed consecutively rather than concurrently.

We conclude there is sufficient evidence to support defendant's count five trafficking conviction.  As to his second contention, because we are not certain what

1

sentence the trial court intended to impose on count five, we will affirm defendant's convictions, reverse the sentence, and remand the matter so the trial court can clarify its sentence.

## BACKGROUND

In the spring of 2023, law enforcement investigated defendant for crimes involving several victims. They arrested defendant in June 2023. During the investigation, law enforcement seized a cell phone from defendant that included text messages to a phone number belonging to 15-year-old Lilly Doe. We limit the background to Lilly as relevant to the contentions on appeal.

### A

Law enforcement contacted Lilly through her mother and interviewed her shortly after defendant's arrest. The audio of the interview was played for the jury, and the written transcript was admitted into evidence. During the interview, Lilly told Detectives Bill Fry and Marcus Ziegler that she met defendant on social media and they exchanged phone numbers. Lilly did not know defendant's real name; she only knew him as "Purge" or "Purge Twin." Defendant did not know she was 15 years old; she told him she was 19.

The detectives showed Lilly a series of text exchanges between the cell phone they seized from defendant and Lilly's phone. One of the messages, dated January 13, 2023, read, " 'Snow Bunny, what goals do you have for this year, Ma?' " Lilly acknowledged the text; she said everyone called her "Snow Bunny" because she is white and knew the text was from defendant because he asked about her goals.

Lilly told the detectives that on January 27, 2023, defendant picked her up from her grandmother's house in the foothills and drove her to San Francisco so she could make some money. Lilly said she did not specifically tell defendant what she was doing

2

but "he probably had an idea." She said men like defendant, who had "been through some things," could tell she was a prostitute.

When defendant picked Lilly up from her grandmother's, Lilly told him that her cell phone was dying so defendant drove Lilly to a gas station, filled his gas tank, and bought her a phone charger. Lilly told the detectives she needed the phone charged because she had to contact defendant for protection while she was on the street. She said she needed protection because she is small and "they're pimps." Lilly described to the detectives how defendant would sit in his car nearby while she stepped "outside" alone. Defendant kept track of her location through a cell phone. She said defendant acted as her protection, but she was not one of defendant's "hoes."

Lilly was "outside" in San Francisco for a short time, but when she got cold, they went to Oakland. Lilly told the detectives she did not want to go to Oakland. She said it was "really ghetto out there" and "that's where all the cheap people go" and "[y]ou have to be from Oakland, really, to step outside" in Oakland. Nevertheless, defendant took her to Oakland where she was outside for about an hour. While they were in Oakland, defendant's car engine stopped and they had to call a tow truck.

After leaving Oakland, defendant drove Lilly to South Sacramento. On the way defendant got a flat tire and they had to get it fixed. When they got to South Sacramento, they stayed the night at a friend's house. The next morning, Lilly went outside to work as a sex worker for herself. When she was done, she called defendant to pick her up and take her home.

The detectives showed Lilly the following text messages that appeared to have been sent on January 27 or 28, 2023:

Defendant: " 'Text me on this phone.' [¶] … 'keep me on standby. No African-American tricks and watch your phone for tricks.' "

3

Lilly:  " 'Okay.' "

Defendant:  " 'Walk where there's not a lot of bitches.  That's how you get a lot of tricks.'  …  'GTFO or get the fuck off your phone and get some money, ma.' "

Lilly:  " 'I don't like – like it here.'  [¶]  . . .  [¶]  'Can we go to [San Jose]?' "

Defendant:  " 'Yeah.' "

Lilly:  " 'Okay, uh, when?' "

Defendant:  " 'TN, tonight.'  [¶]  …  [¶]  'You ready to go to Oakland right now?' "

Lilly:  " 'Yes.' "

Defendant:  " 'All right.  Uh, meet me in the same spot I drop you off at.' "

Lilly:  " 'I'm where you drop me off at.  It's cold ASFK.'  [¶]  …  [¶]  'Uh, they're bein' cheap.  Uh, can we come out tomorrow night and I can do content tonight?' [¶]  …  [¶]  'I don't feel good  …  And my mom tellin' me I need to go home.' "

Defendant:  " 'Do $140 quickie.' "

Lilly:  " 'I'm damn finna cry.  I don't feel right.  You're not gonna answer, bro, and my phone finna die.' "

Later that same night, defendant texted Lilly and said, " '2nd and Marine Way.' "  Lilly told the detectives she thought that was an address in Oakland.  Defendant then said, " 'Blood STFU,' " which Lilly said meant "shut the fuck up, bitch." Lilly texted him back and said " 'I'm on my way' " and attached a map.

The detectives showed Lilly another text exchange from that same night:

Defendant:  " '22nd and Marine Way, Oakland, California.' "

Lilly:  " 'I'm here.  Come down to taco truck.  It's bad.  It hurts super bad.' [¶]  …  [¶]  'So what happens if I don't get trapped, you leave me out here?  I don't feel [good].' "  Lilly told the detectives she had a urinary tract infection that night, and even though defendant told her to "shut the fuck up," he never beat her.

4

Lilly knew defendant was a pimp; she described him as a "boyfriend pimp" because he got one of his girls pregnant.  Lilly said she was not one of defendant's girls and it would be weird if he thought she was.  To her mind, she was like a little sister to him.  The detectives showed Lilly a text message that defendant sent to a woman he was trying to recruit into sex work.  Defendant sent the woman photographs of girls he claimed were his "hoes" and one of the photographs was of Lilly.  Lilly said defendant was lying and that he must have obtained the photograph from her social media.

The detectives also showed Lilly a photograph of her that had been posted on "MegaPersonals" as an advertisement for sex.  There was a phone number attached to the photo.  Lilly said she did not recognize the phone number and did not post the ad, but she recognized the photographs.

The detectives asked Lilly how much money she made when defendant took her to San Francisco and Oakland.  She said she made approximately $3,000.  They also asked her how much money she made on "the Blade" in South Sacramento; she said about $1,000.  The detectives then asked Lilly how she knew what prices to set for sex work.  She told them "I'm cute, you know?  . . .  Nothing lower than 300."  She said when she first started she charged as little as $150 but once she got more recognized she raised her prices.

Lilly told the detectives that the only advice defendant gave her was "never trust anybody."  Defendant also told Lilly she did not have to do sex work; she could be an eyelash tech, a nail tech, or a nurse.  She said that was why he asked about her goals for the year.

B

An amended information charged defendant with offenses involving six victims, including trafficking minors (Pen. Code,[1] § 236.1, subd. (c)(1) -- counts one and five), dissuading a witness (§ 136.1, subd. (b)(1) -- count two), and pandering a minor (§ 266i, subd. (a)(2) -- count seven).

Trial began in March 2024, and Lilly testified. On direct examination, Lilly said she did not want to be there because "[t]here's nothing for me to be here for. [¶] . . . [¶] I don't really even know [defendant]." She said she had "seen him all around Sacramento" approximately four times and they had mutual friends. Lilly followed defendant on social media, but she only knew his nickname "Purge Twin."

Lilly testified that on at least one occasion, defendant picked her up from her grandmother's house late at night. Defendant drove Lilly to a gas station where he bought her a phone charger. She thought they drove to Oakland to "pick up weed." Once in Oakland, defendant and Lilly smoked marijuana. Lilly got out of the car and went to a store; defendant left before she got back. Lilly texted defendant to ask him where he was. She said he kept giving her the wrong address and then the car died. Lilly called her friend for money to pay for a tow truck. On their way back to Sacramento, the car got a flat tire. By then it was maybe 1:00 or 2:00 in the morning and defendant drove Lilly to South Sacramento where he dropped her off at some apartments and Lilly had someone pick her up.

Lilly denied going to San Francisco that night. She told the detectives that photographs of her on defendant's phone had been taken in San Francisco, but defendant did not take those photographs.

The prosecutor asked Lilly if she and defendant had talked about making money that night, and the following colloquy occurred:

---

[1] Undesignated statutory references are to the Penal Code.

"[Lilly:] [W]e were just going to go buy some weed, and then we had car troubles. And then he asked me if I could ask somebody for $90 for the tow truck.

"[Prosecutor:] When you talked to the detectives, did you tell them, well, I was going to make some money, and he was just taking me to Sacramento?

"[Lilly:] Yeah.

"[Prosecutor:] Okay. Or to San Francisco?

"[Lilly:] Nope, it wasn't San Francisco. We went to Oakland to go buy weed.

"[Prosecutor:] Is that what you told the detectives that you were going to make some money?

"[Lilly:] No. What I said was they started showing me ads that they had on his phone of me. [¶] And I said that he made it for me because I don't have an ID, and I paid him money for it.

"[Prosecutor:] Let's break this down a little bit. When you say 'ads,' what are you talking about?

"[Lilly:] MegaPersonal.

"[Prosecutor:] What is MegaPersonal?

"[Lilly:] It is for me to make some money. I don't know how to explain it.

"[Prosecutor:] How do you make money from ads on MegaPersonals?

"[Lilly:] Talk to People.

[¶] … [¶]

"[Prosecutor:] Do you use those ads to exchange sex for money?

"[Lilly:] Nope.

"[Prosecutor:] Are you saying you did not do that when you were with [defendant]?

"[Lilly:] Yeah, I've never done anything like that when I was with him."

The prosecutor asked Lilly if she told the detectives that she used her phone to communicate with defendant while she was working. Lilly did not remember that

7

exchange.  She acknowledged that she used defendant for protection that night: "[W]e went to Oakland, we went to go get some weed.  And [defendant] told me if anything would happen he was there because I have people that I don't like."  She testified that the reason they were together that night was "to hang out and smoke."

The prosecutor asked Lilly about sex work:

"[Prosecutor:]  Did you tell the detectives that you made over $3,000 that night?

"[Lilly:]  No.

"[Prosecutor:]  Did you tell detectives that you don't charge anything less than $300 for sex?

"[Lilly:]  No.

"[Prosecutor:]  Okay.  Because you're saying you've never done sex work, right?

"[Lilly:]  No.

"[Prosecutor:]  And we just have to be clear because it is kind of a double negative.  [¶]  "You're saying that you've never done sex work, correct?

"[Lilly:]  Yes."

Lilly testified she never saw defendant again after that night.  Lilly was not afraid of defendant and her only concern about testifying was that it was a waste of time because she had nothing to say.

The prosecutor showed Lilly the text messages detectives spoke to her about in their interview.  Lilly acknowledged some of the text messages were from her but not all of them.  She said, "everybody has always had my phone.  …  [¶]  Somebody could have been using my phone that night, but these ones don't look like me."

On cross-examination, Lilly testified that she and defendant were only friends. He never threatened her, never hit her, and was not mean to her.  She never talked to defendant about sex work.  Defendant never encouraged her to engage in sex work or offer to help her if she did; he never gave her directions on how to conduct herself during sex work.  Defendant encouraged Lilly to take up cosmetology and

asked her about her goals in life. She never gave defendant money, and he never asked for any.

Lilly testified that the only time she was alone with defendant was the night they went to Oakland, and she did not go to Oakland for sex work. Defendant never set up dates for her and she did not know if he posted any ads for her on one of the sex websites.

Defendant also testified at trial. He knew Lilly and went out with her one time at her request. He knew why she wanted to go to Oakland, but he was not acting as her pimp. She never gave him any money, and he never hit her.

In addition, Detective Fry testified at trial. He had previously qualified as an expert in human trafficking. He explained that in the world of sex work the phrase "going outside" means "going out to an area where prostitution commonly occurs." In Sacramento, that typically means Stockton Boulevard or Watt Avenue. He said "the blade" refers to a roadway used for prostitution. According to Detective Fry, International Boulevard in Oakland is also a prominent prostitution area. He said some sex workers who have been around for a while call it "E14" but the name has changed. A "snow bunny," he said, is a white female sex worker, and "a quickie" refers to "15 minutes of a sex worker's time with a sex buyer."

C

Among other things, the trial court instructed the jury on human trafficking as follows: "To prove the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant caused or induced or persuaded or attempted to cause, induce, or persuade another person to engage in a commercial sex act. [¶] Two, when the defendant acted, he intended to commit a felony violation of . . . section 266h [pimping] and 266i [pandering], and: [¶] Three, when the defendant did so, the other person was under 18 years of age. [¶] . . . [¶] The other person's consent is not a defense to the

9

crime. [¶] Being mistaken about the other person's age is not a defense to the crime." The trial court also instructed the jury on pimping and pandering.

The jury found defendant guilty on two counts of trafficking a minor (§ 236.1, subd. (c) -- counts one and five), dissuading a witness (§ 136.1, subd. (b) -- count two), and pandering a minor (§ 266i, subd. (a)(2) -- count seven). As to count one, the jury found true an allegation that defendant committed the crime by use of force, fear, deceit, coercion, violence, duress, menace or threat (§ 236.1, subd. (c)(2)). The jury deadlocked on counts eight, nine, ten, eleven, and twelve, and the trial court declared a mistrial on those counts. At sentencing the trial court said it was imposing a concurrent five-year term on the count five trafficking conviction pertaining to minor Lilly Doe, which would have resulted in an aggregate sentence of 15 years to life in prison, but it later said the aggregate sentence was 15 years to life plus five years.

## DISCUSSION

### I

Defendant contends there is insufficient evidence to support his count five trafficking conviction pertaining to Lilly.

### A

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence.

10

[Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

"Section 236.1 proscribes and sets forth the penalties for different kinds of human trafficking offenses." (*People v. McDowell* (2024) 99 Cal.App.5th 1147, 1153.) Defendant was charged with, and convicted of, human trafficking within the meaning of section 236.1, subdivision (c)(1), which applies where a "person … causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation" of one of several specific crimes including pimping (§ 266h) and pandering (§ 266i). "In determining whether a minor was caused, induced, or persuaded to engage in a commercial sex act, the totality of the circumstances, including the age of the victim, the victim's relationship to the trafficker or agents of the trafficker, and any handicap or disability of the victim, shall be considered." (§ 236.1, subd. (d).)

"Consent by a victim of human trafficking who is a minor at the time of the commission of the offense is not a defense." (§ 236.1, subd. (e).) "Mistake of fact as to the age of the victim of human trafficking who is a minor at the time of the commission of the offense is not a defense." (§ 236.1, subd. (f).)

B

Defendant argues there is no evidence he caused, induced, or persuaded Lilly to perform a commercial sex act. We disagree.

According to the statement Lilly made to the investigating detectives, defendant picked Lilly up in the foothills and drove her several hours to San Francisco and then to Oakland so that she could perform sex work for money. While Lilly was working in Oakland, defendant directed her to stand away from other sex workers and get off her

11

phone to make more money. When Lilly wanted to leave because she was in pain, defendant told her to perform one more brief commercial sex act before he would take her home.

Lilly told the detectives that when defendant picked her up to go to the Bay Area, he immediately bought her a phone charger so that she could charge her phone. Lilly said in the interview that she needed a charged phone that night to contact defendant while she was working. Lilly said defendant was her protector, and she need protection while she was working because she was a small sex worker. She said she made $3,000 doing sex work in the Bay Area while she was with defendant.

In the interview, Lilly told the detectives she knew defendant was a pimp and he probably knew she was a sex worker. Defendant referred to Lilly as "Snow Bunny," a term used for white, female sex workers. From the totality of the evidence, the jury could reasonably infer that defendant knew Lilly was a sex worker and was encouraging her to perform commercial sex acts.

Defendant relies almost exclusively on Lilly's trial testimony to support his claim of insufficient evidence. Lilly's testimony at trial differed from the statement she gave the detectives during their investigation and conflicted with the text messages between Lilly and defendant. But it was for the jury to resolve any inconsistencies or conflicts in the evidence. (See *People v. Young* (2005) 34 Cal.4th 1149, 1181.) It appears the jury found Lilly's statement to the detectives more credible, and the text exchanges between Lilly and defendant more reliable, than her trial testimony. We do not second-guess that determination on appeal.

Viewing the evidence in the light most favorable to the judgment, there is sufficient evidence to support defendant's conviction for the trafficking of Lilly, a minor.

## II

Defendant also contends the abstract of judgment does not accurately reflect the trial court's oral pronouncement of sentence because it indicates the sentence on count five was imposed consecutively rather than concurrently.

The trial court orally pronounced sentence as follows:

On the count one conviction for trafficking a minor in violation of section 236.1, subdivision (c), with a true finding that defendant used force, fear, fraud, deceit, coercion, violence, duress, or menace of threat of unlawful injury within the meaning of section 236.1, subdivision (c)(2), the trial court imposed 15 years to life in prison.

On the count five conviction for trafficking a minor (Lilly) in violation of section 236.1, subdivision (c), the trial court imposed the low term of five years in prison. The trial court stated that the low term was appropriate because it would result in a total sentence of 15 years to life, which the trial court said was a long and sufficient sentence. The trial court subsequently explained that as to count five, it was aware of section 1170.15, that if the trial court was to impose a consecutive sentence, it would need to impose the midterm fully consecutive. But the trial court said that under *People v. Woodworth* (2016) 245 Cal.App.4th 1473, it had discretion to impose a concurrent sentence (it said a "current" sentence), and that it was doing so.

As for the remaining convictions, the trial court imposed concurrent sentences except for one violation in which sentence was imposed but stayed.

But the trial court then summed up by stating, "So that is 15 years indeterminate sentence plus five years."

Reading the trial court's oral pronouncement of judgment, we are not certain what the trial court intended. The trial court initially said it was imposing a concurrent five-year term on count five, but later stated that the aggregate imposed sentence was 15 years to life plus five years. The latter comment may have been a misstatement, but we decline to assume what the trial court intended. As defendant suggested in his

13

appellate opening brief, it appears appropriate under these circumstances to reverse the sentence and remand the matter to permit the trial court to clarify its sentence. (*People v. Garcia* (1997) 59 Cal.App.4th 834, 838-839.)

DISPOSITION

Defendant's convictions are affirmed, the sentence is reversed, and the matter is remanded to the trial court to hold a new hearing to clarify its sentence. The trial court shall prepare an amended or corrected abstract of judgment as appropriate.


/S/
MAURO, Acting P. J.

We concur:



/S/
MESIWALA, J.



/S/
WISEMAN, J.[*]

---

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.